(C. D. 613)

ARMAND SCHWAB & CO., INC., ET AL. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided April 15, 1942)

Brooks & Brooks (*Frederick W. Brooks* of counsel) for the plaintiffs.
Paul P. Rao, Assistant Attorney General (*Richard E. FitzGibbon* and *Richard H. Welsh*, special attorneys), for the defendant.

TILSON, Judge: The two suits listed above were filed by the plaintiffs therein seeking to recover certain sums of money alleged to have been unlawfully exacted as customs duties on imported hats. Duty was levied on said hats at the rate of 25 per centum ad valorem plus 25 cents per dozen, under paragraph 1504 (b) (2) of the act of 1930, according to the red-ink notations of the appraiser on the invoices, as hemp hats bleached, not sewed, blocked, or trimmed. The plaintiffs claim said hats to be properly dutiable under paragraph 1504 (b) (1) of said act, as hemp hats not bleached, not sewed, and not blocked or trimmed.

There is in evidence herein three hats marked exhibits 1, 2, and 3, which are samples of certain specified items on the invoices, exhibit 4, which is a stipulation of counsel agreeing to the admission of said samples, exhibits 2–A and 2–B, and illustrative exhibits A to K inclusive, all of which have had our careful examination, inspection, and consideration. In addition to the above exhibits, the record contains the testimony of nine witnesses for the plaintiffs and the testimony of three witnesses for the defendant.

During the trial of the case counsel for the respective parties agreed that the hats in question were not blocked or trimmed. These hats were not classified by the appraiser as blocked or trimmed. In fact he definitely states that they were not blocked or trimmed. Neither were they classified by the appraiser as dyed, colored, or stained, and there is no evidence to the effect that the hats were dyed, colored, or stained. Therefore, the only question presented for our determination is whether or not the hats are bleached.

In view of the length of the record we do not deem it advisable or necessary to attempt a detailed statement of the evidence, but shall give only a summary of the same. Witness Goldberg testified for the plaintiffs that from 1930 to 1934 he maintained his own office in China and during that time he was engaged in collecting and shipping hats like exhibits 1, 2, and 3 to the United States, and that during 1937, 1939, and 1940 he made several trips to China and again on those dates purchased hats like exhibits 1, 2, and 3.

With reference to the method and manner of manufacturing these hats the witness stated that they are woven by hand in the mud huts of the peasants, under such conditions that the hats are filthy with mud, vermin, blotched with perspiration, and in all states of dirtiness. To remove such dirt and filthiness they are washed in tubs of very hot water containing soap and nothing else, in which water they are permitted to remain overnight; that they are then starched and

ironed, which gives them the stiff form of exhibits 1, 2, and 3 and irons out the bumps and knots to improve the looks of the hats.

The plaintiffs also offered the testimony of witnesses Hirschhorn, Weber, and Blumenthal, who stated that they had been engaged in buying and selling hats to the millinery trade for 13, 18, and 30 years, respectively, and each testified that for a number of years, practically since hats like exhibits 1, 2, and 3 came on the market in 1924 or 1925, they had bought and sold such hats in the markets of the United States always as "natural"; that they had never bought and sold them as "bleached" hats, and that exhibits 1, 2, and 3 would not be accepted by the trade as a good delivery for "bleached" hats.

The plaintiffs also offered the testimony of three witnesses who had for a number of years been engaged in the bleaching and dyeing of hats like exhibits 1, 2, and 3, all of whom testified that exhibits 1, 2, and 3 are not bleached hats because they show the discolorations and streaks which are removed in the bleaching process; that they had received thousands of dozens of hats in the condition of exhibits 1, 2, and 3 from their American customers to be bleached, and that their customers would not accept hats in the condition of exhibits 1, 2, and 3 as a good delivery for bleached hats; that every necessary process of bleaching hats like exhibits 1, 2, and 3 took place in their bleacheries in the United States, and that what was done to these hats in China was of no assistance or benefit to their bleaching in the United States.

Witness Brennan, who stated that he was in charge of all textile chemical work for the United States Testing Co., Inc., at its Hoboken plant, and a graduate textile engineer, testified, after making microscopical and chemical tests of the hats in question, that said hats were not bleached.

Two American manufacturers of hats like exhibits 1, 2, and 3 testified that they buy hats like exhibits 1, 2, and 3 from the importers or dealers and have them bleached in many thousands of dozens each year; that they could not use exhibits 1, 2, and 3 in their imported condition because the fibers have shadow streaks and different shades which give a mottled effect and must be eliminated before they make them into hats, and that they have always bought and sold them as "natural" hats and never as "bleached" hats.

As against the foregoing testimony of the plaintiffs, the defendant offered the testimony of witness McSorley, who stated that he had been engaged as a Government chemist, located at Philadelphia and New York for a period of approximately 30 years, and who testified that by a visual comparison of exhibits 1, 2, and 3 with a piece of what the witness stated was "Manila hemp in its natural state," marked illustrative exhibit H, in his judgment exhibits 1, 2, and 3 are lighter in shade, lighter in color, than illustrative exhibit H. This witness also gave certain testimony regarding the processes to which

he subjected hemp in performing the so-called "methylene blue test," which were somewhat different from the processes employed by plaintiffs' witness Brennan, but for reasons hereinafter made to appear we do not consider it necessary to set out this testimony in detail. It should be noted, however, that this witness did not make any chemical tests to determine whether or not the imported hats were bleached, nor did he testify that the hats were bleached, but testified merely as to the so-called methylene blue test and the results thereof, but which he did not perform on the imported merchandise.

Witness Davis, a Government employee, who actually made the so-called methylene blue test on the imported hats, testified as to the methods employed by him, or the processes to which he subjected the imported merchandise, which were somewhat different from those employed by witness Brennan. This witness did not testify that the imported hats were bleached hats, but gave as his opinion that these hats had been subjected to the bleaching action of bleaching chemicals.

The defendant then offered the testimony of Mr. Comey, who stated that he was a graduate chemical engineer, that he took a science course and majored in chemistry. This witness testified that he had been engaged in the bleaching and dyeing business of straw fibers, and had had personal supervision of the processes since 1921. This witness was not asked whether or not the imported hats were bleached, but was asked if "In your business since 1921 have you used any soaps which have as their constituent parts bleaching chemicals?," to which he replied "Experimentally, yes."

On cross-examination this witness testified that his company prepared and he signed, as one of the officers, a brief which was submitted to the Committee on Ways and Means of the House of Representatives requesting an additional duty of 25 cents per dozen on hats which are bleached, dyed, colored, or stained, and that he now stands back of what was said in that brief.

On the foregoing record the plaintiffs, in their brief filed herein, contend that the washing to which these hats were subjected in China was a necessary operation before they could be packed and shipped; that the washing applied to them was inadequate to accomplish any bleaching of them; that every necessary process of bleaching them took place in the United States and what was done to them in China was without any aid or benefit to their bleaching after importation; and that the hats are not bleached in a commercial sense in which the tariff act speaks.

We are not particularly impressed with the argument of counsel for the defendant that the soap which was put in the water in which the hats were washed in China contained sufficient chemical bleaching agents in the form of peroxides and perborates to accomplish a bleaching of these hats. It is true that there is no positive testimony that

said soap did not contain such bleaching agent. It is scarcely to be presumed that the Chinese are so much more efficient in the science of bleaching than Americans that they are able to bleach a hat in only 10 or 12 hours with the use of soap, whereas it takes an American a week or 8 days to bleach a hat using peroxides, perborates, and other chemicals.

Referring to the soap used in washing the instant hats, counsel for the defendant, in his brief filed herein, states that:

While it is true that there is no testimony that the soap powders used in China contained these bleaching agents, on the other hand, it is equally true that there is no testimony that the said soap powders did not contain them.

If there were any presumption that the soap used in washing these hats contained any bleaching agent the same was overcome and destroyed by the testimony of the defendant's witness when he stated that during his 21 years in the bleaching and dyeing business he had used soap only *experimentally* for that purpose. Evidently the experiments he had conducted did not prove successful in bleaching hats, otherwise the witness would have so stated, and thereby made his testimony of some value to the defendant. Be that as it may, the record clearly shows that the hats, as imported, were not in fact bleached hats, in that they are not known, bought, sold, and used under the denomination of bleached hats.

The record shows that every necessary process of bleaching these hats took place after importation and that what was done to them before importation was without any aid or benefit to their bleaching after importation. This makes applicable to this case the pronouncements made by this court in *Arnhold* v. *United States*, C. D. 44, which were quoted with approval by the appellate court in affirming the decision of this court in *United States* v. *Arnhold*, 27 C. C. P. A. 135, which we quote in part as follows:

It must be constantly kept in mind that what was done to these skins in the United States was irrespective of the work that was done in China. Whether or not these skins were fully preserved or partially so in China, all the material used in such preservation in China was washed out or removed in the United States, and the skins restored to their natural condition. The processes through which these skins passed in the United States to fit them for ultimate use were all the processes that were necessary to render them dressed skins. Every necessary process of dressing took place in the United States, and what was done to these skins in China was without any assistance or benefit to their dressing in the United States.

Applying the law quoted above to the facts in this case would require a holding that the instant hats are not bleached, but there is another good and sufficient reason which compels us to hold that these hats are not bleached. The Congress, in providing for hats of hemp bleached and not bleached, must be understood to have used those terms in their known commercial sense. On this point we quote

the following from the case of *Two Hundred Chests of Tea*, 9 Wheat., 430; 6 L. ed. 128:

The object of the duty laws is to raise revenue, and for this purpose to class substances according to the general usage and known denominations of trade. Whether a particular article were designated by one name or another, in the country of its origin, or whether it were a simple or mixed substance, was of no importance in the view of the legislature. It did not suppose our merchants to be naturalists, or geologists, or botanists. It applied its attention to the description of articles as they derived their appellations in our own markets, in our domestic as well as our foreign traffic. And it would have been as dangerous as useless, to attempt any other classification than that derived from the actual business of human life. Bohea tea, then, in the sense of all our revenue laws, means that article which, in the known usage of trade, has acquired that distinctive appellation. And even if the article has undergone some variations in quality or mixture, during the intermediate period from 1789 to 1816, when the last act passed, but still retains its old name, it must be presumed that Congress, in this last act, referred itself to the existing standard, and not to any scientific or antiquated standard.

The true inquiry, therefore, is, whether, in a commercial sense, the tea in question is known, and bought, and sold, and used, under the denomination of bohea tea.

Under the above quotation it might well be said in this case that the true inquiry, therefore, is, whether, in a commercial sense, the hats in question are known, bought, sold, and used under the denomination of bleached hats. The uncontradicted testimony in this case is convincing that the instant hats were not known, bought, sold, and used as bleached hats.

In harmony with the above, we quote the following from *Meyer & Lange* v. *United States*, 6 Ct. Cust. Appls., 181:

Without doubt the tunny is, scientifically speaking, a member of the mackerel family, and that scientific classification is unquestionably recognized by most, if not all, modern dictionaries. Nevertheless, the fact remains that such a classification is purely scientific and cannot be accepted as determinative of the common, ordinary, and popular meaning of the term "mackerel." Whether a fish is of one kind or another and what name it should bear is determined by the scientist in accordance with scientific rules founded on the scientific truth that fishes are distinguished by peculiarities and characteristics upon the basis of which they may be systematically classified and separated into designated families, subfamilies, genera, and species. It cannot be said, however, that such designations and classifications have been popularly recognized or that the popular names of fishes have been adopted in pursuance of any rule which would bring such names into harmony with those sanctioned by science. Indeed, it is a matter of common knowledge that many popular names have been applied to fishes and other things wholly without regard to scientific usage or classification, and that such designations not infrequently are to the scientist shockingly incorrect. Therefore, notwithstanding the fact that science has given the name "mackerel" to a whole family of fishes, popular usage may limit the designation to a particular species of the family or extend it to fishes which, scientifically speaking, are not mackerel at all. *As tariff acts are drafted not in the terms of science, but in the language of commerce, which is presumptively that in common use,*

*it follows that even if the tunny fish be a mackerel according to scientific terminology, it cannot be classified as such for customs purposes unless it be popularly or commercially so regarded.* [Italics ours.]

In view of the commercial testimony that the instant hats have, over a long period of time, been known, bought, sold, and used under the denomination of natural or unbleached hats, and that they have never been known, and bought and sold and used as bleached hats, the above quotations would appear to dispose of the scientific testimony of both the plaintiffs and the defendant herein, which leaves only the few words of testimony elicited from witness Comey to support the contention of the defendant in this case.

Bleached hats, then, in the sense of all our revenue laws, means that article which, in the known usage of trade, has acquired that distinctive appellation. The true inquiry, therefore, is, whether in a commercial sense, the hats in question are known, and bought, and sold and used under the denomination of 'bleached hats. The evidence is conclusive that the hats in question, in a commercial sense, are not so known, bought, sold, and used.

It follows, therefore, that the hats in question are not bleached hats, and the collector was in error in so classifying them. The claim of the plaintiffs that the hats in this case enumerated on the invoice under number 321 in suit 57561–K and all the items assessed at 25 cents per dozen additional duty under paragraph 1504 on the invoice covered by suit 60083–K are not subject to the additional duty of 25 cents per dozen under said paragraph 1504, is sustained.

To the extent indicated the claim in these suits is sustained; in all other respects and as to all other merchandise all the claims are overruled. Judgment will be rendered accordingly.